**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

CHANTALE SIGNEY and HEROLD SIGNEY, )
)
)
Plaintiffs, )
)
v. )                    C.A. No. N20C-10-244 FJJ
)
WILLIAM L. PLAFF, M.D., and )
LEWES SPINE CENTER, LLC, )
)
Defendants. )

Submitted: July 7, 2023
Decided: July 25, 2023

**ORDER**

*Upon Consideration of Defendants' Motion to Strike Errata Changes:*
**DENIED.**

1. This medical negligence action arises from two spinal surgeries performed on Plaintiff Chantale Signey by Defendant Dr. William L. Pfaff at the Lewes Spine Center (collectively, with Dr. Pfaff, "Defendants") in January 2019. On April 6, 2023, Defendants deposed Dr. Nicholas Theodore, Ms. Signey's medical expert in this case. Following that deposition, Dr. Theodore submitted an *errata* sheet setting forth multiple "clarifications" ("corrections") of his deposition testimony. Defendants now move to strike a number of those corrections, arguing they materially change Dr. Theodore's deposition answers.

2. After careful review of Dr. Theodore's deposition testimony and *errata* sheet, it appears that his revisions to his deposition answers are not a tactical attempt to

rewrite damaging deposition testimony. Accordingly, for the reasons that follow, Defendants' motion to strike the corrections is **DENIED**.

3. After a series of consultation appointments in late 2018, Dr. Pfaff performed two anterior cervical discectomies on Ms. Signey to address complaints of neck pain in early 2019. Put simply, the intent of the procedures was to relieve compression of Ms. Signey's nerve root and spinal cord.

4. Dr. Pfaff performed the first procedure on January 7, 2019. As he did so, he noted a fluid leak in the left region of Ms. Signey's spine and sprayed a spine sealant in the area to stop the leak. When Ms. Signey awoke, she noted weakness in both arms and paralysis of her right leg. A post-surgical cervical MRI revealed severe spinal stenosis, most pronounced in the area Dr. Pfaff had just performed on, with abnormal cord signal consistent with compressive myelopathy. In other words, the surgery allegedly caused compression of the spine, where the intent of the procedure was decompression.

5. Dr. Pfaff performed the second procedure the next day. Prior to beginning the operation, Dr. Pfaff noted there was still cerebrospinal fluid leaking from the sides of the prior incision and collecting in the Jackson-Pratt reservoir. Nevertheless, he continued with the surgery and removed, among other things, the spine sealant from the day before.

6. Ms. Signey allegedly received no relief of her symptoms from the second surgery. As she claims, her extremities were effectively paralyzed. So, she was transferred on an emergency basis to Thomas Jefferson University Hospital in

2

Philadelphia, Pennsylvania, where orthopedic surgeons performed a posterior cervical decompression and instrumented fusion. These procedures (and the physical therapy that followed) allowed Ms. Signey to recover some motor and sensory capability in her upper and lower extremities, although she alleges significant deficits still remain.

7. Initially, Ms. Signey filed this claim against the Defendants on October 26, 2020. She retained Dr. Theodore as her expert witness shortly after. Dr. Theodore provided his narrative report on November 1, 2021.

8. The Defendants took Dr. Theodore's deposition on April 6, 2023. At the conclusion of the deposition, Dr. Theodore exercised his right to review his deposition transcript. As he did so, the Defendants moved for summary judgment on April 14, 2023. Nearly a month later, Dr. Theodore submitted an *errata* sheet that Defendants contend substantively supplemented and changed his deposition testimony. So, the Defendants filed this motion in response. The corrections on the *errata* sheet Defendants move to strike are as follows:

| Transcript | Question | Answer | Desired Corrections |
|---|---|---|---|
| 89:18 – 90:6 | Q. My apologies (statement). | A. On the CT scan obviously we talked about bony osteophyte and even in the scan report and it's obvious to look at, even the CT report said there is still osteophyte there and there is evidence of seeing a | A. On the CT scan obviously we talked about bony osteophyte and even in the scan report and it's obvious to look at, even the CT report said there is still osteophyte there and there is evidence of seeing a |

3

| | | | |
|---|---|---|---|
| | | cord compression and recommend MRI. Okay. The MRI was done and what the MRI scan shows is, you know, new high signal edema acute type injury in the spinal cord at C6-7 with significant ongoing compression of the spinal cord. Worse than it was preoperatively. | cord compression and recommend MRI. Okay. The MRI was done and what the MRI scan shows is, you know, new high signal edema acute type injury in the spinal cord at C6-7 with significant ongoing compression of the spinal cord. Worse than it was preoperatively. **That is a deviation from the standard of surgical care – that is negligence.** |
| 90: 12 – 91:1 | Q. In your opinion, can the postoperative changes that we see on the MRI and CT of the 7th and or 8th, can that be due to anything other than negligence in your opinion? | A. So I think we went back and said part of the issue is, I mean, again, we know that you can have a worsening after surgery. But I guess the part I have an issue with is that we have this imaging which shows that the compression is ongoing and severe, to me worse than it was before the surgery, and that to me represents an emergency. | A. So I think we went back and said part of the issue is, I mean, again, we know that you can have a worsening after surgery. But I guess the part I have an issue with is that we have this imaging which shows that the compression is ongoing and severe, to me worse than it was before the surgery, and that to me represents an emergency **caused by negligence.** |
| 92: 1 - 20 | Q. Let me get the right words. I apologize then. Hang on so I can | A. Hold on. Let's get this right for one second here. So certainly it is | A. Hold on. Let's get this right for one second here. So certainly it is |

4

| | | | |
|---|---|---|---|
| | get your report. Well I won't fight with you on it but it's in your report. So let me pull it up. | improper to damage the spinal cord. Can it happen? Yes, but it's not proper. It's not what we are trained to do. It's not what we do. It's not our intent. So we're working in a tight space and obviously something happened. Not proper. There was some manipulation, something happened at the time of surgery. So, again, the patient now wakes up with a deficit and we've got new imaging. That's where we are. So I would say improper. Is that negligent in and of itself? Maybe not. | improper to damage the spinal cord. Can it happen? Yes, but it's not proper. It's not what we are trained to do. It's not what we do. It's not our intent. **And where there is more compression present post-surgery that is a negligent deviation.**<br><br>So we're working in a tight space and obviously something happened. Not proper. There was some manipulation, something happened at the time of surgery. So, again, the patient now wakes up with a deficit and we've got new imaging. That's where we are. So I would say **again where more 6 compression was caused by the procedure that is negligent.** |
| 93: 9 - 19 | Q. Okay. So that's what we're on right now. The failure of Dr. Pfaff in this particular case is his failure to appreciate the CT, the MRI | A. Yes. | A. Yes. **In addition to severe compression caused during the procedure.** |

5

| | | | |
|---|---|---|---|
| | and this patient who is waking up with this lower extremity weakness and I don't mean to confine it to that, failing to appreciate that and then going back and immediately addressing that. That's the failure of Dr. Pfaff on standard of care in your mind; fair? | | |
| 95: 17 – 21 | Q. And then that's sort of the first deviation by Dr. Pfaff in your mind in terms of having the information to get her back. Is that a fair statement? | A. Yes. | A. **Causing severe compression was first deviation.** |
| 100: 18 – 101: 7 | Q. And, likewise, even if the very first surgery on the 7th, the one done at 3:30 or so, had been done perfectly with a full decompression in your mind, she still may have had some permanent neurologic sequela; correct? | A. Well if the same thing happened, in other words, if the same operation occurred and something happened during surgery which I'm calling improper in that we don't want that to be -- it's not proper to bang into the spinal cord, so something happened. So that's what I'm calling improper. | A. Well if the same thing happened, in other words, if the same operation occurred and **severe compression** happened during surgery which I'm calling improper in that we don't want that to be -- it's not proper to bang into the spinal cord, so something happened. So that's what I'm calling improper **and negligent.** |
| 101: 12 - 17 | Q. I understand. I understand. When | A. That's correct. | A. **In this instance causing severe** |

6

| | | | |
|---|---|---|---|
| | you say improper you are equating improper to we don't want that to happen, but improper does not, per se, equal negligence in your mind? | | **compression was negligent.** |

9. While Delaware Superior Court Civil Rule 30(e) allows a deponent to make changes to their deposition testimony in form or substance, it does not allow them to improperly alter what they testified to under oath.[1] "A deposition is not a practice quiz. Nor is it a take home exam."[2] An *errata* sheet exceeds the scope of the type of revisions contemplated by Rule 30(e) when the corrections "are akin to a student who takes her in-class examination home, but submits new answers only after realizing a month later the import of her original answers could possibly result in a failing grade."[3]

10. In support of their position, Defendants primarily rely on this Court's recent decision in *Alberts v. All About Women*.[4] The *Alberts* Court was concerned with a defense expert's substantive testimonial changes to deposition testimony after the plaintiff's expert had taken time (at the plaintiff's expense) to review the defense expert's deposition and prepare a Supplemental Disclosure.[5] Finding

---

[1] *Alberts v. All About Women*, 2020 WL 6588643, at *3 (Del. Super. Nov. 10, 2020).
[2] *Id.* (citations omitted).
[3] *Id.*
[4] *See generally id.*
[5] *Id.* at *7.

7

the changes improper, *Alberts* concluded that "[a] tactic, the sole purpose of which is to subvert a procedural device prescribed by the Court's rules of civil procedure, simply cannot be countenanced."[6]

11. The facts in this case, however, lead to a different conclusion from the one reached in *Alberts*. As presented above, Dr. Theodore used the word "improper" multiple times during his deposition when describing the trauma that Dr. Pfaff allegedly caused to Ms. Signey's spinal cord. But his *errata* sheet does not attempt to rewrite his deposition testimony. Instead, it merely clarifies the conclusions in his written narrative report that "the only cause of [Ms. Signey's] spinal cord compression [is] from direct injury to the spinal cord or nerves, incomplete decompression of the spinal cord or nerves, and potentially an excessive improper use of [spine sealant]." Those conclusions have been a prominent part of this case record since November 2021.

12. Dr. Theodore's *errata* sheet does not attempt to "game the system." At most, it suggests that when surgical injury causes additional post-surgery spinal compression, that is a deviation from the accepted standard of care. Given that Dr. Theodore has maintained this position for nearly two years, Defendants' claim that the *errata* sheet will cause them prejudice is rejected.

---

[6] *Id.*

13. The Court will permit thorough cross-examination of Dr. Theodore at trial. Whether his credibility is impaired by reason of the changes he has made to his sworn testimony will be a matter for the jury, and not the Court, to decide.

14. Based on the foregoing, Defendants' motion to strike *errata* changes is **DENIED.**

**IT IS SO ORDERED.**

_/s/ Francis J. Jones, Jr._
Francis J. Jones, Jr., Judge

*Original to Prothonotary*
cc:     Leroy Tice, Esquire
        Jonathan Landua, Esquire
        Gregory McKee, Esquire

9